IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| LINDA JOHNSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:10-cv-04194-NKL |
| | ) |
| LIFE INSURANCE COMPANY OF | ) |
| NORTH AMERICA | ) |
| | ) |
| Defendant. | ) |

ORDER

Plaintiff Linda Johnson claims that Life Insurance Company of North America ("Life Insurance Company") wrongfully terminated her long-term disability plan ("Plan") benefits. Pending before the Court are Johnson's motion for summary judgment [Doc. # 25] and Life Insurance Company's motion for summary judgment [Doc. # 27]. For the following reasons, Johnson's motion is DENIED and Life Insurance Company's motion is GRANTED.

I. **Factual and Procedural Background**

　　A. **Johnson's insurance plan and Life Insurance Company's initial benefits determination**

As an employee of A.G. Edwards, Inc., Johnson was a participant in an employee

welfare benefit plan that was insured and administered by Life Insurance Company. (Defendant's Answer to Plaintiff's Complaint, ¶4). The terms of this policy require only a rational basis for the determination of long-term disability benefits.

Johnson initially applied for long-term disability benefits in January of 1996, claiming neurofibromatosis in her spine and chest, with resulting pain. (Record, p. 814). She also claimed that her pain medications made her tired. (Record, p. 814). At the time of her initial application for long-term disability benefits, Johnson worked as a special project coordinator in the printing department at A.G. Edwards, Inc., a sedentary position. (Record, pp. 46, 811). Her job description did not include driving, using dangerous machinery, or working at heights or in other dangerous types of environments. (Record, p. 811). However, when asked in 1999 to list the equipment Johnson used in her job, she responded "fork lifts, packaging equipment." (Record, p. 542). On May 17, 1996, Life Insurance Company approved Johnson for Long-term disability benefits on behalf of the plan, commencing March 8, 1996. (Record, pp. 715-716).

**B.    Life Insurance Company's Subsequent Investigation of Johnson's Condition**

Eleven years later, on December 3, 2007, at Life Insurance Company's request, Johnson completed a disability questionnaire and activities-of-daily-living form. (Record, pp. 477-480). Johnson stated that she could not work due to neurofibromatosis, two dislocated discs and arthritis, constant pain, and resulting heavy medication. (Record, p. 477). Johnson further indicated that she could only drive four to five blocks. (Record, p. 477). In a section titled "Check the things you do regularly," Johnson placed check marks next to – and indicated how many hours a day and days a week she engaged in these activities – cooking, laundry,

2

reading, and watching television. She did not place check marks next to cleaning, shopping, yardwork, gardening, and "Other" and drew over the blanks for hours per day and days per week. (Record, p. 477).

Johnson's 2007 office visits with her pain doctor, Dr. Smith, indicated reasonably normal functionality coupled with subjective complaints of pain. (Record, p. 407, 41, 413, 416, 418). On May 19, 2008 and May 20, 2008, and at Life Insurance Company's request, Johnson underwent a functional capacity evaluation. (Record, pp. 328-356). The functional capacity evaluation results showed that Johnson was capable of functioning at a "sedentary" job over an eight-hour work day. (Record, p. 328).

During July 28 through July 30, 2008, Life Insurance Company placed Johnson under surveillance. (Record, pp. 287-308). This surveillance recorded Johnson walking, entering and exiting her vehicle, driving, shopping inside a store, bending over to look at items, bending over to retrieve items, pushing a shopping cart full of groceries, loading and organizing the groceries into her truck, taking the groceries into her residence, picking and pulling weeds, tending to flowers, bending over to tend to her cats, sitting on her front landscaping while talking to people, retrieving her mail and garbage cans, and talking on the phone. (Record, pp. 259, 287-308, surveillance compact discs, Exhibit "3").

In 2008, Life Insurance Company spoke with Johnson's pain doctor, Dr. Smith, and Johnson's primary care physician, Dr. Naidu. Life Insurance Company indicated that it had determined that Johnson was capable of returning to a sedentary occupation and asked the doctors to provide additional medical documentation contrary to these findings if it existed.

3

(Record, pp. 276-277). On August 21, 2008, Dr. Smith responded that he had no further medical documentation to contradict the findings of Life Insurance Company's disability evaluation. (Record, p. 274). On August 26, 2008, Dr. Naidu responded that she was not a disability physician and was not responsible for Johnson's disability insurance or trying to claim disability for her. She indicated she was Johnson's primary care physician and treating Johnson's diabetes, elevated cholesterol, and some pain management. (Record, p. 273).

In 2008, Life Insurance Company received a fax from A.G. Edwards employee, Marla Klopmeyer, stating that two A.G. Edwards employees who claimed they had known and worked with Johnson while she was employed there described her job there as a sedentary desk job. (Record, p. 310).

Based on Dr. Smith's and Dr. Naidu's records, Johnson's disability questionnaire, the functional capacity evaluation, and the surveillance, Life Insurance Company terminated long-term disability benefits after September 10, 2008. (Record, pp. 257-260). Life Insurance Company informed Johnson she no longer met the definition of "disabled" under the Plan. (Record, pp. 257-259).

### C. Johnson's First Appeal to Life Insurance Company

On February 18, 2009, Johnson appealed the denial of her long-term disability benefits. On appeal, Johnson submitted updated medical records from Dr. Smith. (Record, pp. 238-247).

On February 27, 2009, Life Insurance Company's nurse case manager reviewed Dr. Smith's records, and concluded that the additional medical records provided were consistent

with the ability to function in a sedentary job that Johnson demonstrated in the functional capacity evaluation. (Record, p. 228).

To further support her appeal, on March 6, 2009, Johnson, through her counsel, provided to Life Insurance Company "interrogatory questions" from Dr. Smith along with additional medical records. (Record, pp. 215-227). According to Dr. Smith's interrogatory answers, Johnson had pain from her neurofibromatosis tumors. (Record, p. 226). Dr. Smith also responded that significant pain would "possibly" cause her to miss up to six days a month even at a sedentary job. (Record, p. 227).

On March 25, 2009, in support of her appeal, Johnson also submitted a vocational report from vocational expert Gary Weimholt. (Record, p. 207-208). Mr. Weimholt opined that based on Dr. Smith's interrogatory answers, Johnson's pain and tiredness from medication rendered her unable to carry out the material duties of her regular occupation. (Record, p. 207).

On March 30, 2009, Life Insurance Company referred all available medical evidence for a medical review through a service known as Intracorp. (Record, p. 202). Intracorp then retained Phillip Jordan Marion, M.D., to perform a peer review. (Record, pp. 189-193). Dr. Marion specializes in physical medicine and rehabilitation/pain medicine. (Record, p. 193). He reviewed Johnson's medical records from 1995 until his report. (Record, pp. 189-190).

Dr. Marion was also able to speak with Johnson's treating physicians, Dr. Naidu and Dr. Smith, prior to issuing his report. Dr. Naidu indicated she had not specifically addressed disability issues or Johnson's ability to work, rather referring such issues to Johnson's pain management specialist. She also indicated there was no specific medical condition that she was

treating Johnson for that would prevent Johnson from working. (Record, p. 192). Dr. Smith told Dr. Marion that Johnson continued to complain of pain that was reasonably controlled by medication. Dr. Smith believed Johnson should be able to work at a light or sedentary occupational level. (Record, p. 192). Dr. Marion concluded that Johnson's medical records did not show that Johnson continued to be disabled.

On April 22, 2009, Life Insurance Company upheld its termination of benefits based on the medical evidence and Dr. Marion's review. (Record, p. 187). Life Insurance Company noted in its correspondence with Johnson that it "reviewed all evidence on file." (Record, pp. 84-84).

    **D.**    **Johnson's Second Appeal to Life Insurance Company**

On August 6, 2009, Johnson, through her attorney, filed a second appeal of her long-term disability termination. (Record, p. 171). In support of that appeal, Johnson submitted additional office notes from Dr. Smith as well as a second set of questions and answers from Dr. Smith. (Record, pp. 173-184). One question to Dr. Smith asked "[w]hen you stated that Ms. Johnson 'should be functionally capable of working at the light or sedentary occupational level' did this also include the fact that she may miss work due to chronic pain related to her neurofibromatosis?" Dr. Smith answered "[it] is true that she may miss work because of chronic pain." (Emphasis added). Dr. Smith also indicated that her pain medications would cause drowsiness, affecting her ability to do sedentary work and that pain would cause her to miss work. (Record, p. 183-184). When asked about his representation to Dr. Marion that Johnson would be functionally capable of working at the light or sedentary occupational level, Dr. Smith stated that he was not asked to consider the

6

affect of absenteeism or drowsiness due to pain medications. (Record, p. 184). Dr. Smith also agreed that if Johnson said that she had significant pain that would cause her to miss work, this was consistent with her disease process. (Record, p. 184).

On October 28, 2009, Life Insurance Company referred Johnson's claim to Intracorp for a second medical peer review with Dr. Rene Jaso, a board certified general surgeon and board certified in internal medicine. (Record, p. 163). Dr. Jaso reviewed Johnson's records dating back to 1994 and through the present. (Record, pp. 156-158). Dr. Jaso believed that Johnson had functional limitations, but that they were secondary to the use of chronic narcotic medications rather than actual significant functional limitations. (Record, p. 160). Dr. Jaso opined that Johnson had the ability to function in a sedentary occupational level, but noted safety concerns given Johnson's high doses of narcotic pain medication. (Record, p. 160). Dr. Jaso agreed that the surveillance video suggested that Johnson could function at a sedentary level. (Record, p. 160). Dr. Jaso also made attempts to speak with Dr. Smith and Dr. Naidu but was unsuccessful. (Record, p. 161).

On December 17, 2009, Life Insurance Company determined that the safety concerns referenced in Dr. Jaso's evaluation would not be an obstacle to Johnson's sedentary occupation because her regular job did not require driving dangerous machinery, working at heights, or working in other dangerous types of environments. (Record, p. 13).

On December 17, 2009, Life Insurance Company again upheld its termination of Long-term disability benefits. (Record, p. 153-155). Life Insurance Company told Johnson in its correspondence that "Johnson's complete file, including any additional information you

submitted on appeal, was reviewed in its entirety without deference to prior reviews."
(Record, p. 153-155).

## II. Discussion

### A. Summary Judgment Standard

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A defendant who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir. 1991) (citation omitted). If a plaintiff has the burden of proof at trial on a claim and the defendant has filed a motion for summary judgment, the plaintiff must identify admissible evidence sufficient to make a submissible case at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If the plaintiff cannot identify such facts, the defendant is entitled to judgment as a matter of law. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884 (1990) (quoting *Celotex*, 477 U.S. at 322).

### B. Review of Plan Administrator's Decision

Because Johnson's Plan gives the administrator discretionary authority to determine eligibility for benefits, the Court reviews the administrator's decision for abuse of discretion. *Ortleib v. United HealthCare Choice Plans*, 387 F.3d 778, 781 (8th Cir. 2004). Under this standard, a plan administrator's benefits decision will be

8

upheld as reasonable so long as it is supported by substantial evidence. *Fletcher-Merrit v. Noram Energy Corp.,* 250 F.3d 1174, 1179 (8th Cir. 2001). The plan administrator's decision will be reversed only if it is arbitrary and capricious. *Groves v. Metro Life Ins. Co.*, 438 F.3d 872, 874 (8th Cir. 2006).

### C. Overview

Here, each party claims that there are no genuine issues of material fact and that the undisputed facts support judgment as a matter of law in their favor. Their disputes can be summarized as follows: (1) Whether Life Insurance Company had a conflict of interest sufficient to render its denial of benefits arbitrary and capricious; (2) Whether the medical opinions of Johnson's pain doctor, Dr. Smith, and vocational expert Dr. Weimholt render the denial of Johnson's benefits arbitrary and capricious; (3) Whether the 2008 functional capacity evaluation and three-day video surveillance of Johnson, along with any other information Life Insurance Company considered in denying Johnson's benefits, constitute substantial evidence for that decision; (4) Whether Johnson's duties included driving a forklift, such that Life Insurance Company's failure to consider these duties renders the denial of benefits arbitrary and capricious.

### D. Conflict of Interest

Life Insurance Company is both Johnson's plan administrator and the insurance company that ultimately pays her benefits, and therefore has an inherent conflict of interest. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 114-15 (2009). This conflict does not change the standard of review, but should be weighed as a factor in

9

determining the reasonableness of the decision and serves as a tiebreaker among closely-balanced factors. *Hackett v. Standard Ins. Co.*, 559 F.3d 825 (8th Cir. 2009).

A conflict of interest takes on greater importance "where circumstances suggest a higher likelihood that it affected the benefits decision," and takes on less significance where the provider took steps "to reduce potential bias and to promote accuracy." *Glenn*, 554 U.S. at 117. Examples of circumstances that suggest a higher likelihood of bias are when an administrator encourages a claimant to seek Social Security benefits but disregards the Social Security Administration's findings, and when the administrator appears to emphasize records supporting a denial. *Id.* at 118.

The Court concludes that the circumstances in this case do not suggest that Life Insurance Company's conflict of interest influenced its decision. Although Life Insurance Company encouraged Johnson to apply for Social Security benefits, it did not disregard the Social Security Administration's findings. Rather, it paid Johnson's disability benefits for eleven years. Life Insurance Company only stopped paying benefits after acquiring new evidence of Johnson's functionality, specifically the functional capacity evaluation, video surveillance, and peer reviews. *See Jackson v. Metropolitan Life Ins. Co.*, 303 F.3d 884, 890 (8th Cir. 2002).

Although Life Insurance Company's failure to mention Mr. Weimholt's conclusions does raise a suspicion, it must be considered in context. Life Insurance Company relied on a functional capacity evaluation, three days of video surveillance, two independent reviews of Johnson's medical records, and follow-up questions to Drs.

Smith and Naidu in making and confirming its cancellation of Johnson's benefits. There is no evidence or reasonable inference that Life Insurance Company intentionally omitted discussion of Mr. Weimholt's conclusion. The Court is, therefore, unconvinced that Life Insurance Company's inherent conflict of interest affected its decision making.

  E. **Opinion of Dr. Smith**

Johnson erroneously argues that the opinion of Johnson's pain doctor, Dr. Smith, entitles her to summary judgment. In response to interrogatory questions Dr. Smith indicated (1) Johnson's medical diagnosis could "possibly" support a conclusion that Johnson would miss up to six days a month of sedentary work from chronic pain; (2) side effects of Johnson's medication "could" interfere with her ability to perform even sedentary work; and (3) when Dr. Smith indicated, on April 7, 2009, that Johnson was capable of sedentary work he was not "at all asked to consider the effect of absenteeism or drowsiness due to pain medications."

However, Dr. Smith's statements are phrased as mere possibilities in response to narrow questions. These statements do not undermine more definitive evidence relied upon by Life Insurance Company, including Dr. Jaso's and Dr. Marion's conclusions, the functional capacity evaluation, video surveillance, and Dr. Smith's own statements that Johnson's pain was reasonably controlled by her medication such that she was functionally capable of working in a light or sedentary occupation.

  F. **Opinion of Mr. Weimholt**

Johnson also argues that Life Insurance Company's decision is arbitrary and capricious for failure to consider Mr. Weimholt's opinion. Johnson cites *Norris v. City Bank, N.A. Disability Plan* for the proposition that "[a] Plan Administrator abuses its discretion when it ignores relevant evidence." [Doc. # 26 at 52], citing 308 F.3d 880, 885 (8th Cir. 2002). This is an overstatement of that holding. The *Norris* court did find an abuse of discretion, but only after weighing the ignored evidence (which it characterized as "extensive") against the evidence actually relied upon for the decision (of which there was "little, if any"). *Norris v. City Bank*, 308 F.3d at 885. As such, a more correct statement of the *Norris* holding is that where a plan administrator ignores relevant evidence, a reviewing court will consider that evidence in determining whether substantial evidence exists to support the administrator's decision. Thus, assuming Life Insurance Company did ignore Mr. Weimholt's opinion, this Court must weigh that evidence with evidence actually mentioned by Life Insurance Company to determine whether substantial evidence exists for the denial of Johnson's benefits.

Mr. Weimholt's conclusions are based solely on Dr. Smith's interrogatory responses, which the Court has already said were not sufficient to show that Life Insurance Company's denial was arbitrary and capricious. Even considering Mr. Weimholt's conclusions, the Court finds substantial evidence exists for Life Insurance Company's conclusion.

### G. Functional Capacity Evaluation

Johnson argues that the functional capacity evaluation does not support Life Insurance Company's conclusion. Johnson first argues that there is no evidence that this study considered the side effects of Johnson's medication on her functionality. Regardless, the record demonstrates that Life Insurance Company gave due regard to these side effects in its determination of Johnson's disability, by questioning Johnson's treating physicians, reviewing Johnson's entire medical record, and observing Johnson through video surveillance for three days.

Johnson next argues that because there is evidence that Johnson's condition varied from day to day, the testing was not adequate to assess her condition. Specifically, Johnson argues that because the testing only covered six hours in two days, it cannot be generalized to assess Johnson's functionality in consecutive eight-hour work days. Johnson points to no evidence that physical therapist Reeves did not or could not employ reliable procedures for generalizing to a full work day. That Ms. Reeves spread the test over two days instead of one helps to allay this concern, by comparing Johnson's functionality on different days. That Life Insurance Company also relied on three days of video surveillance to assess Johnson's functionality further allays this concern. That Life Insurance Company also relied on independent studies that reviewed records of Johnson's treatment for pain and questioned those treating her demonstrates that it was not arbitrary and capricious for Life Insurance Company to weigh the functional capacity evaluation as a factor in its decision making.

H.  Video Surveillance

Johnson argues that the three-day video surveillance of Johnson does not support Life Insurance Company's denial of benefits, because the activities depicted in the video are not inconsistent with her disability claim. Life Insurance Company argues that Johnson's activities in the video contradict Johnson's responses to a disability questionnaire in which Johnson indicated she could only drive four to five blocks and that she did not regularly clean, shop, do yardwork, or garden.

The Court finds that it was not arbitrary and capricious for the Life Insurance Company to conclude that the video contradicts prior statements by Johnson. The fact that Johnson may have interpreted the questions and her answers differently does not mean that Life Insurance Company's conclusions are arbitrary and capricious on this record. A reasonable person viewing the video could conclude that her activities were inconsistent with a disabling condition.

## I. Duty to Operate Forklift

Johnson claims that the duties of her former occupation included operating a forklift, and that Life Insurance Company's failure to consider this job duty makes its disability determination arbitrary and capricious. Johnson refers to the *Dictionary of Occupational Titles 4th Edition* as evidence that operating a forklift amounts to "medium" work.

Life Insurance Company points out that this Court should defer to Life Insurance Company's interpretation of its insurance plan so long as it is reasonable. *See Darvell v. Life Ins. Co. of N. Am.*, 597 F.3d 929 (8th Cir. 2010). The *Darvell* court also held

14

that such an interpretation must be "largely consistent with evidence of duties…actually performed." *Darvell v. Life. Ins. Co. of N. Am.*, 597 F.3d at 936.

Life Insurance Company reasonably concluded that Johnson's job duties did not include operating a forklift. The only evidence Johnson presents on this issue is a disability questionnaire in which Johnson did not mention operating a forklift when asked about her "duties," but, when asked what tools or equipment she used, she responded "fork lifts, packaging equipment." (Record, p. 542). On the other hand, Life Insurance Company received multiple descriptions of the duties of Johnson's position from her former employer, A. G. Edwards, none of which included any mention of operating a forklift. (Record, p. 811). Life Insurance Company also received a fax in 2008 from an A.G. Edwards employee stating that two employees who knew and worked with Johnson described the job as a sedentary desk job. (Record, p. 310). It was not unreasonable for Life Insurance Company to conclude that using a forklift was not part of Johnson's actual duties.

## III. Conclusion

Accordingly, it is hereby ORDERED that Johnson's motion for summary judgment [Doc. # 25] is DENIED and Life Insurance Company's motion for summary judgment [Doc. # 27] is GRANTED.

                                        s/ Nanette K. Laughrey
                                        NANETTE K. LAUGHREY
                                        United States District Judge

Dated: <u>September 1, 2011</u>
Jefferson City, Missouri